**In re FLAGSHIP FRANCHISES OF MINNESOTA, LLC, Flagship Franchises of Minnesota, Inc., Debtors.**

**Nos. 12–36898 (KHS), 12–36900 (KHS).**

United States Bankruptcy Court, D. Minnesota.

Jan. 4, 2013.

---

**24.** That decision was *In re Kraft,* 192 B.R. 735

(Bankr.W.D.Mo.1996).

Edwin H. Caldie, Leonard, Street and Deinard, Minneapolis, MN, for Debtor.

Michael R. Fadlovich, US Trustee Office, Minneapolis, MN, for U.S. Trustee.

## MEMORANDUM AND OPINION

KATHLEEN H. SANBERG,
Bankruptcy Judge.

This expedited motion came on for hearing on January 2, 2013. Flagship Franchises of Minnesota, LLC and Flagship Franchises of Minnesota, Inc. (collectively "the debtor") requested that the court determine that the appointment of a patient care ombudsman is not necessary here pursuant to 11 U.S.C. § 333(a)(1). There were no objections.

Edwin H. Caldie appeared on behalf of the debtor. Christopher J. Harayda appeared on behalf of Milestone Growth Fund. Michael R. Fadlovich appeared on behalf of the United States Trustee.

The court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 151, 157(a)-(b)(1), 1334(a)-(b) and Local Rule 1070–1. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

Based on the evidence received and considered, the arguments of counsel and all relevant files, the court makes this Order pursuant to the Federal and Local Rules of Bankruptcy Procedure. For the reasons stated below, the court finds that an ombudsman is not necessary for the protection of the debtor's clients in this case and grants the debtor's motion.

## FACTS

The debtor operates an adult healthcare day center in Savage, Minnesota, and provides in-home adult day care services for chronically ill and vulnerable adults, including adults with Alzheimer's, Parkinson's, and brain injuries. It conducts business under the assumed name "Sarah Adult Day Services" and began operating in July, 2002. It filed its chapter 11 bankruptcy petition on December 12, 2012.

The debtor's chief executive officer, Deborah K. Delaney, testified that the debtor is subject to stringent licensing requirements and state regulations. The debtor is licensed by the Minnesota Department of Human Services and the Minnesota Department of Health, both of which audit the debtor's processes annually. The debtor must comply with regulations established by the Human Services Licensing Act, the Human Services Background Studies Act, and the Vulnerable Adults Act. Minn.Stat. §§ 245A, 245C, 626.5575, 626.5572 (2012). The debtor is subject to license regulations for an adult day care center in Minnesota, established by Rule 223. Minn. R. 9555.9600–.9730 (2007). Ms. Delaney also testified about the debtor's comprehensive internal procedures to protect the health and privacy of its clients. The debtor offers a higher level of care to its clients than is required by state law; state law requires an employee to patient ratio of 1 to 6 or 1 to 8 (depending on the level of care needed), while the debtor maintains a 1 to 5 ratio.

According to Ms. Delaney, the debtor employs registered nurses and trained medical assistants, all of whom must be licensed by the state of Minnesota before working with clients. Failure to properly take care of clients and follow the laws regulating care would result in the loss of the individual employee's license. The debtor monitors the employees' license status and continuing education units.

The debtor's in-home services are also subject to monitoring and regulation. Ms. Delaney stated that only registered nurses provide one-on-one services in a client's home. The registered nurse is required to inspect the client's home first and must report any arising issues to the proper authorities. Weekly reports are filed by the nurse assigned to the client and placed in the client's file. The Minnesota Department of Human Services conducts a review

of the in-home care services once a year as well.

Ms. Delaney also testified that the entire staff receives ongoing training and education. Each month, the debtor holds mandatory in-service sessions for all employees. All staff and volunteers must submit to a background check prior to working for the debtor. All of the debtor's employees sign confidentiality agreements. Only management employees have access to the clients' records, which are locked in the nurse's office. All computers are password protected.

Finally, Ms. Delaney testified that the main reason for filing the chapter 11 was to allow for renegotiation of its franchise agreements.

## DISCUSSION

When a debtor is a healthcare provider, the court must appoint an ombudsman unless it finds that the appointment is not necessary for the protection of patients pursuant to 11 U.S.C. § 333(a)(1). Section 333(a)(1) states:

> If the debtor in a case under chapter 7, 9, or 11 is a health care business, the court shall order, not later than 30 days after the commencement of the case, the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case.

11 U.S.C. § 333(a)(1). The debtor acknowledges that it is a healthcare provider but requests that the court determine that the appointment is not necessary.

■ An analysis under 11 U.S.C. § 333(a)(1) is necessarily a fact intensive one. Courts have followed a nine factor test articulated in *In re Alternate Family Care,* 377 B.R. 754, 758 (Bankr.S.D.Fla. 2007). *See In re Valley Health Sys.,* 381 B.R. 756, 761 (Bankr.C.D.Cal.2008); *In re N. Shore Hematology–Oncology Assocs., P.C.,* 400 B.R. 7, 11 (Bankr.E.D.N.Y.2008); *In re Starmark Clinics, LP,* 388 B.R. 729, 734 (Bankr.S.D.Tex.2008); *In re Jennifer L. Ney Do Inc.,* No. 11–63563, 2011 WL 6032839, at *1 (Bankr.N.D.Ohio Dec. 5, 2011); *In re Barnwell Cnty. Hosp.,* No. 11–06207–DD, 2011 WL 5443025, at *5–6 (Bankr.D.S.C. Nov. 8, 2011); *In re Vartanian,* No. 07–10790, 2007 WL 4418163, at *1 (Bankr.D.Vt. Dec. 13, 2007). These factors include:

(1) the cause of the bankruptcy;

(2) the presence and role of licensing or supervising entities;

(3) the debtor's past history of patient care;

(4) the ability of the patients to protect their rights;

(5) the level of dependency of the patients on the facility;

(6) the likelihood of tension between the interests of the patients and the debtor;

(7) the potential injury to the patients if the debtor drastically reduced its level of patient care;

(8) the presence and sufficiency of internal safeguards to ensure the appropriate level of care; and

(9) the impact of the cost of the ombudsman on the likelihood of a successful reorganization.

■ The weight given to the factors is at the discretion of the reviewing court. *In re North Shore Hematology Assocs. P.C.,* 400 B.R. at 11. No one factor is determinative.

## Analysis of the Nine Factors

### (1) The Cause of Bankruptcy

■ Ms. Delaney testified that the debtor filed for bankruptcy in order to renegotiate its franchise agreements and to resolve the substantial unsecured debt accrued in starting the business. The debtor's bankruptcy filing did not arise out of any deficiencies, or allegations of deficiencies, in its care for its clients. The debtor did not file bankruptcy in order to renegotiate contracts with its nurses or other medical staff. Thus, the cause of the bankruptcy does not weigh in favor of appointing an ombudsman.

### (2) The Presence and Role of Licensing or Supervising Entities

The debtor is subject to substantial monitoring and regulation by state agencies. It is licensed by the Minnesota Department of Human Services and the Minnesota Department of Health. These agencies audit the debtor's processes and procedures annually. Also, the debtor must comply with regulations established by the Human Services Licensing Act, the Human Services Background Studies Act, and the Vulnerable Adults Act, as stated above. Finally, the debtor is subject to license regulations for an adult day care center in Minnesota.

Aside from the licenses held by the debtor, the debtor employs registered nurses and trained medical assistants for its clients' care. These nurses and medical assistants must be licensed by the state of Minnesota. Failure to properly take care of clients and follow the laws regulating care would result in the loss of the individual employee's license. The debtor monitors the employees' license status and continuing education units.

The debtor's in-home services are also subject to monitoring and regulation. The debtor permits only a registered nurse to provide one-on-one services in a client's home. The registered nurse is required to inspect the client's home before services begin and must report any issues to the proper authorities. Weekly reports are filed by the nurse assigned to the client and placed in the client's file. The Minnesota Department of Human Services conducts a review of the in-home care services once a year.

The regulations, reviews, and employee licensing requirements established and conducted by Minnesota's agencies demonstrate protection for the debtor's clients.

### (3) The Debtor's Past History of Client Care

In the past 10 years of operation, no federal, state, or local regulatory authority initiated any disciplinary action against the debtor. While one complaint was filed against the debtor with the Minnesota Department of Human Services in 2008, the resulting investigation found no basis for the complaint.[1] Ms. Delaney testified that the few concerns or issues raised by the families of the clients are usually related to drop off and pick up times. There is no evidence of improper or inadequate care provided by the debtor.

### (4) The Ability of the Debtor's Clients to Protect Their Rights

Here, the clients are vulnerable adults or adults with chronic medical conditions.

1. The complaint apparently arose from a dispute between the debtor and the president of the debtor's condominium association. Ms. Delaney testified that the dispute concerned the use of the outdoor patio attached to the debtor's workplace. The president later acknowledged that he filed the complaint in retaliation for not being allowed to use the patio.

Most of the clients do not have the ability to protect themselves. Rather, it is up to the clients' families and the debtor's employees to protect the clients' rights. In order to do this, the debtor's clients and their families are advised of their rights when they first begin using the debtor's services. The debtor requires clients to sign a service agreement, civil rights compliance documents, a client bill of rights, a notice of privacy practices, a consent form for use and/or disclosure of health information to carry out treatment, and HIPPA disclosure documents prior to the initiation of services.

A handbook is also provided to all clients and their families that includes the debtor's fully developed complaint process. Ms. Delaney testified that the few complaints received from clients and their families concerned drop off and pick up times. The debtor handles most complaints within one day, and complaints are documented in the clients' records. The debtor receives overall high customer satisfaction reviews and is in contact with the families of patients each day.

The clients are either transported to and from their homes or dropped off and picked up by family each day. No client stays at the facility overnight. Thus, family members are able to monitor the care received by the clients on a daily basis and protect the clients' rights.

### (5) The Level of Dependency of the Debtor's Clients on the Facility

The debtor offers services under the medical/social model and is licensed for chronic care management. The debtor provides adult healthcare day center services and in-home adult day care services for chronically ill and vulnerable adults, including adults with Alzheimer's, Parkinson's, and brain injuries. The average length of a client's stay at the debtor's center and the average length of the debtor's in-home services are six to ten hours. The debtor does not provide long term care.

Because of the nature of the clients and their medical needs, they are dependent on the debtor's services while at the facility during the day and at the houses receiving in-home care.

### (6) The Likelihood of Tension Between the Interests of the Debtor's Clients and the Debtor

The debtor's clients and the debtor share the same interest in high quality care. Without the high standard of care, clients would not use the services and the debtor would lose its licenses. Ms. Delaney testified that the reason the debtor filed for bankruptcy does not relate to the care that it provides to its clients. Thus, there is little likelihood of tension between the debtor's clients and the debtor.

### (7) The Potential Injury to Debtor's Clients if the Debtor Drastically Reduced its Level of Care

If the debtor were to drastically reduce its level of care there is the potential for physical injury to the debtor's clients because the clients are vulnerable adults and adults with chronic illnesses. While the debtor maintains an employee to client ratio that is higher than that required by the state, if it went below the state required ratio and clients were not appropriately monitored or cared for, clients could be injured.

### (8) The Presence and Sufficiency of Internal Safeguards to Ensure the Appropriate Level of Care

The debtor has substantial internal safeguards to ensure that its clients receive the appropriate level of care. The debtor currently operates with a 1 to 5 employee

to client ratio, which is above the state law requirement of 1 to 6 or 1 to 8 (depending on the level of care needed). The debtor provides a 1 to 1 ratio for in-home clients and for certain clients that need further care at the facility. Nearly all services are provided publicly and private services are administered by registered nurses licensed by the state. The debtor carries insurance, which the debtor will continue to maintain throughout the bankruptcy.

The debtor's safeguards include its implementation of procedures and standards for its employees. The debtor requires its entire staff to receive ongoing training and education. The state requires licensed employees to earn eight continuing education units each year to renew their license. Each month, the debtor holds mandatory in-service sessions for all employees. All staff and volunteers must submit to a background check prior to working for the debtor. All of the debtor's employees sign confidentiality agreements. Only management employees have access to the clients' records, which are locked in the nurse's office. All computers are password protected.

All of these safeguards are sufficient to ensure proper care for the debtor's clients and their rights.

### (9) The Impact of the Cost of the Ombudsman on the Likelihood of a Successful Reorganization

Ms. Delaney indicated in her testimony that the appointment of a patient care ombudsman would be a substantial administrative expense for the debtor, which would make reorganization extremely difficult. An ombudsman would be required to interview all patients and staff, monitor the quality of patient care on an ongoing basis, and report to the court periodically, all resulting in additional expenses for the debtor. Documents provided for other motions in this case show that the debtor does not project any reduction in the level of care. Rather, as Ms. Delaney testified, the bankruptcy filing allows for additional revenue to maintain the high level of care for its clients. The cost associated with the appointment of an ombudsman would impact the debtor's total cash balance and ability to maintain its level of care and reorganize.

After reviewing the factors, three of the factors weigh in favor of appointing an ombudsman (factors 4, 5, and 7) and six of the factors weigh against (factors 1, 2, 3, 6, 8, and 9). The factors weighing in favor of appointment concern the potential for harm and the ability of the clients to protect themselves. The factors weighing against appointment concern the mitigation of the potential for harm. The facts supporting the debtor's motion, weighing against appointment, include:

The debtor has demonstrated a high quality of care prior to the bankruptcy and there is no indication that the quality will suffer after the filing. Rather, Ms. Delaney's testimony indicates that the bankruptcy has given them the breathing room necessary to continue the high level of care while dealing with its franchise agreements. The debtor has substantial internal controls and processes to monitor care. It employs licensed medical professionals and monitors their licenses and continuing education. It is subject to state audit and licensing. Family members observe the care on a daily basis because clients are only at the facility for part of the day. There is no long term care and no one stays overnight. Thus, if the quality of care dropped, it would be noticed and dealt with immediately.

■ The cost of an ombudsman on the estate would be substantial. Many courts have weighed the cost heavily when decid-

ing whether or not to appoint an ombudsman. *See generally In re Alternate Family Care,* 377 B.R. at 758; *In re Valley Health Sys.,* 381 B.R. at 764. There has been criticism of cases deciding not to appoint an ombudsman on the basis of cost. *See* Erin Masin, *The Patient Care Ombudsman: Taking Cost Out of Patient Care Considerations,* 26 Emory Bankr. Dev. J. 91 (2009); Jeff Bohm & Jennifer Chang, *Proper Protection of Patients In Health Care Businesses In Bankruptcy: Continuing Development and Application of Section 333 of the Bankruptcy Code,* 44 UCC L.J., no. 3, 2012. Cost is considered here, but it is given less weight than those factors concerning the potential for harm and mitigation of harm.

The analysis of the nine factors demonstrates that an ombudsman is unnecessary under the facts of this case.

## CONCLUSION

The court is concerned for the wellbeing of the debtor's clients and, after examining the totality of the circumstances, is convinced that there are substantial safeguards that will continue to protect the rights and health of the debtor's clients without the appointment of an ombudsman. Therefore, the court concludes that an ombudsman is not necessary at this time and will not be appointed. If client care is compromised and it becomes necessary to appoint an ombudsman, the court will again consider it pursuant to Fed. R. Bankr.P. 2007.2(b) ("If the court has found that the appointment of an ombudsman is not necessary, ... the court, on motion of the United States trustee or a party in interest, may order the appointment at a later time if it finds that the appointment

has become necessary to protect patients.").

THEREFORE, IT IS ORDERED:
1. The debtor's request for expedited relief is granted.
2. The appointment of an ombudsman is not necessary in this case and, therefore, the motion is granted.